UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION )<br><br>Plaintiff )<br><br>vs. )<br><br>FIRST CHOICE MANAGEMENT SERVICES, INC., AND GARY VANWAEYENBERGHE, et al., )<br><br>Defendants )<br><br>vs. )<br><br>LARRY GODWIN, MIKE McCARTY, LARRY YARBERRY, )<br><br>Third Party Plaintiffs ) | Case No. 3:00-CV-446-RM |

OPINION AND ORDER

This matter is before the court on cross-motions for summary judgment

regarding certain oil and gas leases in Texas. These motions raise many complex

questions, but the threshold question is simple and dispositive: whether a freeze

order issued pursuant to the powers and purposes of the Securities Act of 1933

and Securities Exchange Act of 1934, as well as pursuant to the inherent

equitable powers of a federal court, prevents the automatic reversion of a fee

simple determinable that otherwise would occur pursuant to state common law?

It does. This goes to the very core of what it means for a court to freeze assets:

only the court may authorize disposal of the assets it froze. For this reason, and because the equities of this case demand it, the court GRANTS final judgment in favor of the receiver and ALCO and against the third party claimants.

## I.

The parties, particularly the third party claimants, raise complex arguments about Texas oil and gas law that largely go beyond what is necessary to decide this case. To sort the necessary facts from the arguments raised, the court first addresses the relevant facts and then sets forth the arguments raised.

## A.

In July 2000, the Securities and Exchange Commission initiated a civil action against Gary Van Waeyenberghe and First Choice Management Services, Inc. The SEC also initiated an action in the Southern District of Indiana against principals in league with Mr. Van Waeyenberghe in <u>SEC v. Ballinger, et al.</u>, 1:03-cv-1659-LJM-WTL. On January 8, 2003, this court entered final judgment against the defendants and ordered disgorgement of $31.3 million; the court already had established an equitable receivership to prevent the dissipation, concealment or disposition of any assets of First Choice and its subsidiaries that had been obtained using funds swindled from investors in a fraudulent scheme.

After entry of final judgment, the court directed the receiver to liquidate First Choice assets and return as much of the funds as possible to the defrauded investors. More than $1 million of the defrauded investor funds had been used to acquire oil and gas leases in Texas in the name of Branson Energy Texas, a sham corporation that First Choice principal Dennis Weaver had set up for the sole purpose of acquiring the oil and gas interests in question today. BET purchased these leases from ALCO Oil & Gas Co., LLC in July 2002. ALCO was to operate the leases, which were in their secondary term.

On September 17, 2003, this court issued its latest and most detailed freeze order [Doc. No. 178]. The court stated, "As required by the previous Orders of this Court, no Assets or Proceeds may be disposed, moved, transferred, abandoned, concealed, conveyed, encumbered or used in any way without the prior approval of this Court or the Receiver." Order, September 17, 2003, at ¶ I.C. The order required that all assets or proceeds be "frozen in their current location and form." Id. at ¶ II.A.1. Disposition of the assets or proceeds required an agreement between the parties (including the receiver) or a decision by this court upon summary proceedings. Id. at ¶ II.B. The BET leases in question are subject to this freeze order.

After the freeze order, BET and ALCO litigated the ownership of these leases until Michael Wilson was expelled from ALCO and the companies began to cooperate with each other. ALCO tried to have the freeze lifted in the Southern District of Indiana, but with Mr. Wilson still involved with ALCO, the Southern

District declined to lift the freeze to allow ALCO to operate the leases because ALCO couldn't show that lifting of the stay would protect the status quo. Order, May 4, 2005, 1:03-CV-01659-LJM-TAB [Doc. No. 648-4]. Once Mr. Wilson was out of the picture, BET and ALCO came to an agreement and this court's order of September 5, 2006 [Doc. No. 487] determined that ALCO had assigned ownership to BET on July 25, 2002. The receiver designated ALCO to be the operator of the leases. The September 5, 2006 order lifted the freeze order as to ALCO so ALCO could operate the leases without violating the freeze order.

The receiver's next task was to liquidate BET's assets (sell the leases) and give restitution to defrauded First Choice investors. But the receiver couldn't do this because certain other parties were known to claim interests in the property, including the third party claimants here: Larry Godwin, Mike McCarty, and Larry Yarberry (collectively, the Godwin claimants). Following procedures established in the September 5, 2006 order, the Godwin claimants filed a petition to intervene to make their claim to the leases in question [Doc. No. 492]. The facts needed to resolve the Godwin claimants' claim are set forth in the parties' Joint Stipulation of November 26, 2008 [Doc. Nos. 598, 645-4], which the court incorporates here in its entirety and reiterates here only as necessary.

After issuance of the freeze order, the receiver notified the relevant parties of the asset freeze, including to the Godwin claimants, who knew of the leases because Larry Godwin had operated them previously when ALCO owned the leases. The receiver maintained continuous contact with the Godwin claimants

about the assets. Nevertheless, in the spring of 2004, the Godwin claimants obtained new non-warranty leases, subject to court order, on top of some of the leases BET owned without notifying the receiver. When the receiver learned of these top-leases in late 2005, he objected—and continues to object—and notified the Godwin claimants that this violated the court's freeze order. Only one set of leases can be valid: those owned by BET since July 25, 2002 or those created by the Godwin claimants in the spring of 2004 after the Godwin claimants had actual notice of the September 17, 2003 freeze order. The leases in question include Perkins A (TRRC # 09-00091); Perkins E (TRRC # 09-00092); Perkins F (TRRC # 09-00093); Perkins H (TRRC # 09-00094); Perkins L (TRRC # 09-00095); East Holliday Parkey Sand Unit (TRRC # 09-00963); East Holliday Lime Unit (TRRC # 09-14196); Annie B. Wallace (TRRC # 09-00097).

The Godwin claimants' summary judgment motion encourages the court to go beyond the stipulated facts. The court does so only to the extent necessary to demonstrate that the incidental operation of state law proposed here doesn't render its freeze order ineffective.

The leases in question produced no more than nominal amounts of oil, beginning around mid-2003, when the freeze order was issued (it is immaterial for purposes of these arguments and this opinion that one or two of the leases ceased production a little earlier than this). Zero-to-nominal production continued through at least November 2007, and the court has no reason to believe this non-production status has changed. *See* Jessie Ray Wilson Deposition [Doc Nos. 645-

3, 654-2]; Texas Railroad Commission Production Records [Doc. Nos. 645-5, 645-7, 645-8, 645-9, 645-10, 645-11, 645-12, 645-13].

After the court's September 5, 2006 order lifting the freeze order as to ALCO, ALCO tried to produce oil again. The Godwin claimants, however, filed their claim to these oil and gas leases on October 13, 2006, creating a litigious cloud over title to the assets. Companies engaged in the business of buying and selling crude oil, sometimes called "gatherers," will, in conformity with industry practice, await the disposition of litigation before releasing proceeds from the gathered oil to the producers of the oil, lest they be liable for remitting the proceeds to the wrong party. Affidavit of Lisa G. Brewer, October 19, 2009, at ¶¶ 6-14 [Doc. No. 667-8]. This creates difficulties because an oil lease operator can't operate the oil wells without revenue from gatherers. Affidavit of Robert Russell, Jr., October 16, 2009, at ¶ 8 [Doc. No. 667-2].

Nonetheless, Mike McCarty, one of the third party claimants, says in his affidavit that a "prudent operator" could have produced the oil profitably from the end of March, 2003. Affidavit of Mike McCarty, July 21, 2009 [Doc. No. 645-2]. On the other hand, to produce the oil from September 2003 until the stay was lifted in September 2006 would have violated the freeze order. *See* Order, September 5, 2006; Order, May 4, 2005, 1:03-cv-01659-LJM-TAB. Additionally, this court has been aware that this litigation has prevented ALCO from operating the leases. *See* Reports Regarding Operations Pursuant to 9/5/2006 Order, March 10, 2008 and March 12, 2009 [Doc. Nos. 580, 616].

The court, pursuant to the parties' agreement, ordered the parties to brief the legal and equitable issues in the Godwin claimants' claim, with the briefing to begin by the receiver filing a motion for judgment. Order, June 4, 2009 [Doc. No. 630]. The receiver filed his motion for judgment on August 10, 2009. On the same day, the Godwin claimants filed a motion for summary judgment. The receiver moved to strike the summary judgment motion, and has also asked for a 90-day continuance to allow further discovery should the court not rule favorably on his motion for judgment. These motions are now ripe for ruling.

B.

In their summary judgment motion, the Godwin claimants essentially argue that because this court's freeze orders never stated in so many words, "you shall not produce oil," nothing kept ALCO from producing oil on these leases even after entry of the court's freeze order. The Godwin claimants say that the oil leases terminated because oil wasn't produced, so others could acquire new leases.

The Godwin claimants point out that in Texas, oil and gas leases are fee simple determinables that automatically terminate upon a triggering event without any action by the parties. Oil and gas leases beyond their primary term automatically terminate when "production in paying quantities" stops. That's what happened here, they say, although the receiver responds that more discovery would be needed to determine whether the nominal amounts produced since 2003 add up to "paying quantities."

The Godwin claimants argue that this automatic reversion upon the cessation of production isn't a mere contractual covenant that the court may stay. Rather, they contend that to decide for the receiver would be to convert a fee simple determinable into a fee simple, thereby substantially altering the rights between the parties in a way contrary to the usual rule in law and equity that no one may acquire greater property rights than those held by the person from whom they are acquired.

The Godwin claimants assert that 28 U.S.C. § 959(b) requires receivers to manage property according to the requirements of state law. By not producing the leases in paying quantities the receiver (really, BET and ALCO), they argue, didn't follow the "requirements" of state law, so the leases terminated pursuant to state law. The Godwin claimants also note that the Texas Railroad Commission has fined and penalized ALCO in the last few years on account of these leases.

The receiver argues that the 2003 freeze order prevented production on the oil and gas leases. The receiver contends that production has been further prevented because the Godwin claimants' claim has inhibited gatherers from supplying the revenue needed to operate the oil leases since 2006. Regarding the court's equitable powers, the receiver simply notes that if this freeze order can't be enforced here and now, then the court "is without power."

The receiver points out that Texas oil and gas leases often contain force majeure and savings clauses that excuse the cessation of production on a lease. More discovery is needed to determine whether the leases in question contain

such clauses. But, the receiver points out, even without such clauses in an oil and gas lease, Texas courts apply the temporary cessation of production ("TCOP") doctrine to excuse non-production on account of mechanical breakdowns and litigation.

As to the equities of the situation, the receiver asserts (without contradiction) that BET and ALCO have carried all the liabilities of maintaining the lease equipment over the last several years and that if the Godwin claimants' top-leases are ruled valid, the Godwin claimants stand to gain all profits without sharing any of the liabilities BET and ALCO carried all these years.

## II.

This litigation has dragged on for several years, allowing layers of dust to slowly encrust the core issues. There is one key fact that the receiver essentially argues and that the Godwin claimants rather openly admit: the Godwin claimants don't claim an interest in the BET leases or dispute BET's ownership of these leases. Rather, the Godwin claimants, with notice of this court's freeze order, "top-leased" the leases in question on the theory that an incidental and automatic operation of Texas oil and gas common law terminated BET's leases without leave of the court or the agreement of the receiver.

A freeze order, by definition, suspends the state law rights of parties to property and prevents third parties with no prior interest in the property from acquiring an interest in the property without the court's leave. The Godwin

claimants' claim arises from an attempt to take property rights after entry of the freeze order and without any claim to the property before entry of the freeze order. This claim runs so counter to well-established principles of law and equity that the court declines the Godwin claimants' request for a hearing on the matter.

A.

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court faced with cross-motions for summary judgment "construe[s] all inferences in favor of the party against whom the motion under consideration is made." Allen v. City of Chicago, 351 F.3d 306, 311 (7th Cir. 2003) (quotation omitted).

In addressing the receiver's motion, which deals with the threshold question of the freeze order's effect, the court construes facts in favor of the Godwin claimants. The only contested issue that might affect the equities is why oil production has essentially ceased on the leases since the freeze order's entry in 2003. The Godwin claimants assert, through Mike McCarty's affidavit, that a prudent operator could have produced the leases profitably. Still, such a "prudent

operator" would have then been violating the freeze order. Because this court and its sister court in the Southern District of Indiana understood that the orders of these courts prevented the leases' operation, the court declines to give Mr. McCarty's unsupported assertion any weight in deciding the receiver's motion. To construe McCarty's statement to mean that the leases have lain dormant without excuse since this court's freeze order would be to draw an *un*justifiable inference in the Godwin claimants' favor: it would contravene the law of this case as laid down by the orders of these federal courts pursuant to their well-established powers.

## B.

Federal law, not state law, determines the effects of a freeze order entered pursuant to a federal court's inherent equitable powers and the purposes of the Securities Act of 1933 and Securities Exchange Act of 1934. Nonetheless, the Godwin claimants argue that state law frustrates the purpose of this court's freeze order. The court disagrees with the Godwin claimants' analysis of Texas state law. In this discussion, the court does not decide this case as a matter of Texas state law—principles of comity and the lack of any need to predict what a Texas court would do under this unique set of facts caution in favor of simply correcting the Godwin claimants' presentation of Texas state law.

> In Texas it has long been recognized that an oil and gas lease is not a "lease" in the traditional sense of a lease of the surface of real property. In a typical oil or gas lease, the lessor is a grantor and

11

> grants a fee simple determinable interest to the lessee, who is actually a grantee. Consequently, the lessee/grantee acquires ownership of all the minerals in place that the lessor/grantor owned and purported to lease, subject to the possibility of reverter in the lessor/grantor. The lessee's/grantee's interest is "determinable" because it may terminate and revert entirely to the lessor/grantor upon the occurrence of events that the lease specifies will cause termination of the estate.

Natural Gas Pipeline Co. of Am. v. Pool, 124 S.W.3d 188, 192 (Tex. 2003) (citations omitted).

A typical oil and gas lease is granted for a primary term of a specified time, and for a secondary term in which the lease may be kept alive only by production in paying quantities or a savings clause. Krabbe v. Anadarko Petroleum Corp., 46 S.W.3d 308, 315 (Tex. App. 2001). This means that a cessation of production during the secondary term terminates the lease automatically unless there is a savings clause or an excuse. Id. (citing Watson v. Rochmill, 155 S.W.2d 783, 784 (Tex. 1941)).

Texas courts have mitigated the harshness of this rule of automatic reversion by a "necessarily implied" temporary cessation of production clause into leases. Midwest Oil Corp. v. Winsauer, 323 S.W.2d 944, 946 (Tex. 1959); Krabbe v. Anadarko Petroleum Corp., 46 S.W.3d at 315; *see also* Natural Gas Pipeline Co. of Am. v. Pool, 124 S.W.3d at 203-204 (Jefferson, J., dissenting) (discussing TCOP doctrine and gathering sources).

> The strictness of the above rule has been modified where there is only a temporary cessation of production due to a sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like. Under such circumstances, . . . the

> lessee is entitled to a reasonable time in which to remedy the defect
> and resume production.

Watson v. Rochmill, 155 S.W.2d at 784. Some "such like" causes for a temporary cessation of production include litigation, which fits within the principle running through Texas case law that forfeiture ought not occur where a temporary cessation of production occurs because a circumstance prevents a well's operation without fault or choice of the lessee. *See* Midwest Oil Corp. v. Winsauer, 323 S.W.2d at 945; Watson v. Rochmill, 155 S.W.2d at 784; Krabbe v. Anadarko Petroleum Corp., 46 S.W.3d at 318-319 (discussing litigation as a cause "like" those permitted under Watson); Scarborough v. New Domain Oil & Gas Co., 276 S.W. 331, 336 (Tex. App. 1925) ("[A] forfeiture for temporary cessation of production without fault of lessees should not be allowed as a matter of law."); *see also* Cobb v. Natural Gas Pipeline Co. of Am., 897 F.2d 1307, 1309 (5th Cir. 1990) ("In [Midwest Oil Corp. v.] Winsauer, the Texas Supreme Court held that, as a matter of law, a cessation of production for 174 days was temporary where there was mechanical breakdowns and litigation between the lessor and lessee."); *cf.* Natural Gas Pipeline Co. of Am. v. Pool, 124 S.W.3d at 208 (Jefferson, J., dissenting) (arguing for broadening the TCOP doctrine to include not only excuses like mechanical breakdown or litigation but also economic feasibility of production).

The Godwin claimants didn't mention the TCOP doctrine until the receiver pointed it out; then the Godwin defendants didn't address its applicability when

oil and gas leases are mired in litigation. Instead, the Godwin claimants tried to distinguish the cases as applying only between the lessor and lessee. There is no indication here that the lessors have sought to have the leases with BET terminated, but if TCOP applies during litigation between the lessor and lessee, it seems reasonable that TCOP would apply when the lessee must fight off parasitic challenges from would-be lessees.

It appears to this court that a Texas court would find that BET and ALCO were excused from producing the leases during the freeze period from September 2003 through September 2006, and since then because of the litigation the Godwin claimants initiated. Federal law controls, so this comment is dictum. The court simply disagrees with the Godwin claimants' reading of Texas oil and gas law, and doesn't understand Texas law to contradict the purposes of this court's freeze order even if it were controlling. Going beyond these considerations to questions about production in paying quantities, force majeur clauses, savings clauses and the like would be an unnecessary complication and well beside the point.

C.

The Godwin claimants argue that 28 U.S.C. § 959(b) incorporates Texas oil and gas law so that BET and ALCO had to produce on the leases or lose them, notwithstanding the freeze order. The court sees no support for the Godwin claimants' reading of the statute.

Section 959(b) states as follows:

> [A] trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

Section 959(a) indicates that receivers are liable to suit for their actions. Courts have read § 959(b) in context with § 959(a) to mean that receivers can be held liable in tort and must follow state environmental and other regulatory laws. *See* In re Cajun Elec. Power Co-op., Inc., 185 F.3d 446, 453-454 (5th Cir. 1999) ("[W]e agree with our sister circuits that the import of this section is that the general bankruptcy policy of fostering the rehabilitation of debtors will not serve to preempt otherwise applicable state laws dealing with public safety and welfare." (quoting Robinson v. Mich. Consol. Gas Co., 918 F.2d 579, 589 (6th Cir. 1990); Saravia v. 1736 18th St., N.W., Ltd., 844 F.2d 823, 827 (D.C. Cir. 1988))); H.L.S Energy Co., Inc. v. Lowe, 151 F.3d 434, 438 (5th Cir. 1998) ("Under federal law, bankruptcy trustees must comply with state law [requiring plugging of wells in Texas]."); *see also* Midatlantic Nat'l Bank v. N.J. Dept. of Envtl. Protection, 474 U.S. 494, 502, 507 (1986) (noting that bankruptcy trustee does not have power to abandon property in contravention of state or local laws designed to protect public health or safety); *cf.* In re Am. Associated Systems, Inc., 373 F. Supp. 977, 979 (E.D. Ky. 1974) ("The exception created in 28 U.S.C. § 959(a) is intended to permit actions redressing torts committed in furtherance of the bankrupt's

business operations, and is not cast to foster interference with the use, control, maintenance and operation of the bankrupt's property." (citations and quotations omitted)).

The Godwin claimants don't contend that nonproduction under the freeze order violated an affirmative Texas state law, regulation, or public safety or welfare provision that requires a lease's forfeiture as a penalty for the violation. The Texas Railroad Commission has fined ALCO with regard to these leases, but regulatory penalties (which have arisen because of the environmental problems associated with the inability to pump the wells properly) don't amount to Texas law affirmatively taking property rights away from leaseholders. No court has read § 959(b) as interfering with a receiver's property rights in the way the Godwin claimants propose, and the Godwin claimants haven't persuaded this court to be the first court to do so.

The Godwin claimaints protest that a ruling for the receiver would convert a fee simple determinable into a fee simple. Not only may this court not do that, they say, but § 959(b) affirmatively prevents this court from doing that. The court agrees that a receiver ordinarily acquires no greater rights in the property than those possessed by the debtor or previous property holder. *See* Javitch v. First Union Securities, Inc., 315 F.3d 619, 625 (6th Cir. 2003) ("The general rule is that a receiver acquires no greater rights in property than the debtor had and that, except as to liens in existence at the time of the appointment, the receiver holds the property for the benefit of general creditors under the direction of the court.").

But the court doesn't agree with the Godwin claimants' characterization of what the freeze order did. The freeze order doesn't change the nature of the estate created by these oil leases. The freeze order suspends the estate—freezes it—until disposition by the court. It is a fee simple determinable held in suspense until the court gives the green light to the receiver to sell the leases. The leases will remain fee simple determinables after that sale, but no longer held in suspense so that terminating conditions (such as non-production) will have their automatic effect again. Section 959(b) isn't implicated at all, but these considerations lead to the heart of the matter: this court's equitable powers.

D.

The federal courts' traditional equitable powers include the power to appoint a receiver. *See* FED. R. CIV. P. 66. These traditional equitable powers are inherent and are affirmed through the explicit Congressional mandates found in the Securities Act of 1933 and the Securities Exchange Act of 1934. *See* <u>Mitchell v. Robert DeMario Jewelry, Inc.</u>, 361 U.S. 288, 291-292 (1960). The civil penalty imposed through the consent decree required the disgorgement of the money First Choice principal Gary Van Waeyenberghe swindled from investors, pursuant to the Securities Act of 1933 § 20(d) (codified at 15 U.S.C. § 77t(d)) and Securities Exchange Act of 1934 § 21(d)(3) (codified at 15 U.S.C. § 77u(d)(3)). The parties stipulated to, and don't dispute, this court's jurisdiction over this action, but it's worth remembering that Congress defined the court's jurisdiction as "over all suits

in equity and actions at law brought to enforce any liability or duty created by this title." Securities Act of 1933 § 22(a) (codified at 15 U.S.C. § 77v(a)); Securities Exchange Act of 1934 § 27 (codified at 15 U.S.C. § 78aa).

With the Sarbanes-Oxley Act of 2002 § 305, Congress explicitly and broadly codified the traditional equitable powers exercised by federal courts under the Securities Act of 1934: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." Securities Exchange Act of 1934 § 21(d)(5) (codified at 15 U.S.C. § 78u(d)(5)). These traditional powers include the freezing of assets and the appointment of a receiver to return funds to swindled investors. "It is now well established that Section 22(a) of the 1993 Act and Section 27 of the 1934 Act, confer general equity powers upon the district courts. Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy." <u>SEC v. Manor Nursing Ctrs., Inc.</u>, 458 F.2d 1082, 1103 (2d Cir. 1972) (citations omitted); *see also* <u>Deckert v. Independence Shares Corp.</u>, 311 U.S. 282, 288 (1940) ("The power to enforce [the Securities Act] implies the power to make effective the right of recovery afforded by the Act. And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case."); *cf.* <u>Mitchell v. Robert DeMario Jewelry, Inc.</u>,

361 U.S. 288, 291 (1960) (discussing FLSA, "The court may go beyond the matters immediately underlying its equitable jurisdiction and give whatever other relief may be necessary under the circumstances.").

Congress succinctly explained that the purpose of these equitable powers is to benefit swindled investors. Congress sought to deter and punish securities fraud, and explicitly granted federal courts broad and exclusive jurisdiction and power to craft equitable remedies such as restitution for swindled investors. The Godwin claimants argue that an automatic and incidental operation of state property law neuter the Congressional purposes and this court's orders. The court disagrees.

Even if Texas courts would hold that the BET leases terminated, the Constitution's Supremacy Clause determines whether state law allows federal law to have its otherwise legitimate effect. A contrary view lies outside the "legal contemplation" of our constitutional system. *See* Testa v. Katt, 330 U.S. 386, 392 (1947); *see also* Altria Group, Inc. v. Good, 129 S. Ct. 538, 542 (2008) ("[W]e have long recognized that state laws that conflict with federal law are 'without effect'"). Rather, the question is whether federal law suspends or otherwise affects the normal operations of state law in a case such as this one. It does. *See* LaShawn A. v. Barry, 144 F.3d 847, 853-855 (D.C. Cir. 1998) (noting that a federal court's broad equitable powers include overriding state or local law for the purpose of enforcing a decree designed to remedy violations of federal law); *cf*. Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176 (1942) (noting that the

prohibitions and benefits of a federal statute may not be set at naught by state statutes or common law).

The suggestion that state law somehow limits the effect of a federal court's orders is so anomalous as to render it quite difficult to find a case like the one before the court. It seems fundamental that the otherwise incidental operations of state law don't somehow limit the effect of a federal court's freeze order. This is how federal freeze orders have teeth: they can and do suspend state property rights and laws.

The Godwin claimants knew of this federal freeze order when they top-leased some of BET's leases, creating leases that conflict with BET's leases. The Godwin claimants had no property interests in the leases before the freeze order. Production on the leases ceased because of this court's freeze orders. Production remained in abeyance because of the Godwin claimants' parasitic claims to these leases. The equities of the situation favor the receiver and ALCO, and the law doesn't support the Godwin claimants' claim. It is time to lay this to rest.


III.

The court GRANTS the receiver and ACLO's joint motion for judgment [Doc. No. 648] and DENIES the third party claimants' motion for summary judgment [Doc. No. 645]. The court DENIES the receiver and ALCO's joint motion to strike for lack of prejudice [Doc. No. 653] and DENIES AS MOOT the receiver and ALCO's joint request for a 90 day continuance.

It is ORDERED that BET, in line with the court's September 5, 2006 order, has legal and equitable title to the subject leases and the third-party claimants' non-warranty top-leases are null and void. Pursuant to the receiver and ALCO's joint request, it is ORDERED that any remaining issues between ALCO, the receiver, and the third-party claimants be resolved in the relevant state court. The court awaits the Receiver's request for authorization to dispose of the leases.

SO ORDERED.

ENTERED: January 12, 2010

_____/s/ Robert L. Miller, Jr._____
Chief Judge
United States District Court

cc: all counsel of record