UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff | ) ) |
| vs. | ) CAUSE NO. 3:00-CV-446 RLM ) |
| FIRST CHOICE MANAGEMENT SERVICES, INC. and GARY VAN WAEYENBERGHE, | ) ) ) ) ) |
| Defendants | ) |

## MEMORANDUM

In May of this year, the court of appeals affirmed this court's finding that SonCo had violated an order of this court by failing to take over the operation of oil and gas leases in Texas, but remanded for this court to explain its reasoning for ordering SonCo to forfeit the $600,000 it had paid the receiver and Alco. This memorandum is meant to explain that SonCo paid that $600,000 for consideration with a value well beyond $600,000, including release from multi-million dollar class litigation in another nation. SonCo's civil contempt caused the receiver and Alco to lose the benefit of everything they had given up when agreeing to this court's original order. It appeared that the receiver and Alco likely were entitled to more than that, but establishing the need for more compensation would have required expenditure of more of the money that belonged to defrauded

investors. To reduce the probability of defrauded attorneys paying more attorney fees, and to reduce the chances that SonCo could interfere any further with the receiver or Alco, the court simply let the $600,000 stay where it was and ordered SonCo to quitclaim its interests in the oil and gas leases.

I

This court assumes the reader's general familiarity with the facts set forth by the court of appeals. Brutally summarizing the facts pertinent to today's order, this receivership flows from a securities fraud action brought by the SEC. The suit arose from extensive fraud perpetrated by First Choice Management Services, Inc. and its principal Gary Van Waeyenberghe. The court appointed a receiver to track down and recover First Choice's assets and reimburse the defrauded First Choice investors as nearly as possible for their losses. The receiver's search for assets led to a group of oil and gas leases in Texas held by Branson Energy Texas, a sham corporation.[1] The receiver took ownership of those leases and appointed Alco Oil & Gas Co. to continue as operator of the leases. SonCo Holdings claimed an interest in the leases. Litigation involving the receiver, Alco, and SonCo ensued in Canada (a class action in Alberta) and in a state court in Archer County, Texas.

---

[1] This wasn't the extent of the receiver's work. The receiver recovered a very significant sum of money for the defrauded investors.

This court entered a stay order to keep things in place until the receiver, Alco, and SonCo could straighten things out in this court.

A

In September 2006, this court (while vacating an earlier order that resulted from a fraud on the court in which the receiver contends SonCo was involved) tried to set forth a procedure for summary resolution of any claims against these leases, including SonCo's. SonCo then intervened to pursue its claims. Eventually, the court scheduled an evidentiary hearing for June 2009; that hearing was rescheduled on the receiver's motion three times, finally to January 2010, to allow settlement discussions and finalization of the settlement. The receiver, Alco, and SonCo presented the court with an agreed order containing their settlement, and the court entered the order on January 20, 2010. (Doc. # 683). To call that order an "Agreed Order" as it was captioned then is confusing in light of the ensuing events, so this memorandum refers to it simply as "the January 2010 order." At the end of the sequence of events contemplated by the January 2010 order, SonCo was to have owned and operated the leases.

The parties drew the court of appeals' decision to two aspects of SonCo's nonperformance under the January 2010 order. First, SonCo was late in paying the $580,000 it was required to pay under the January 2010 order; the receiver and Alco agreed to forgive that untimeliness if SonCo ponied up another $20,000,

for a total of $600,000. Second, SonCo never posted a $250,000 bond with the Texas Railroad Commission, which was to "replace Alco's bond so that Alco and the Receiver may obtain the release of its bond paid for with defrauded investor funds." (Doc. # 683, at 5).

The January 2010 order included a 90-day injunction to, as SonCo later explained it, "allow SonCo to get matters in order and to protect Alco from new claims, compliance obligation, taxes or sanctions imposed on Alco during the past six years of litigation, including the Court-ordered freeze instituted in December of 2002 and specifically on September 17, 2003, as well as the claims process instituted on September 5, 2006." (Doc. # 693, at 1). In August 2010, SonCo moved to extend that injunction by another 90 days to allow it to take steps required by the Texas Railroad Commission. The receiver's response appeared not to oppose the injunction's extension, so the court extended the injunction to November 8, 2010, and informed the parties that it anticipated no further extensions of the injunction. (Doc. # 695).

B

Four days before the extended injunction was to expire, SonCo sought another extension — this time for two years.

A flurry of briefing and continuances of the scheduled hearing ensued. By the time the hearing was held on December 13, 2010, the receiver's position had

evolved into a request that the court "reform" the January 2010 order. That request (Doc. # 720) wasn't filed electronically until SonCo's counsel already had left her office for court, and the receiver hadn't fully conceptualized what the reformation would amount to, so the court denied the motion to extend the injunction, but directed further submissions on the evolving motion to modify or reform the January 2010 order. A hearing was set for January 24, 2011. Before the hearing, the receiver and Alco effectively moved for an extension of the January 2010 order's injunction to protect their interest in the leases from reverting to others. (Doc. # 726). Conscious of how long other proceedings already had been enjoined, the court extended the motion through the day of the hearing, but no longer.

At that hearing, the court denied the motion to reform or modify the January 2010 order. Because SonCo's attorney told the court that SonCo could take the necessary steps (including the filing of "P-4" forms and a "P-5" form with the Texas Railroad Commission), the court gave SonCo a final opportunity to do what it said it would do. The court extended the injunction to February 25, 2011, and ordered that:

- SonCo is granted to and including February 20, 2011 (the court realizes this is a Sunday) to fully comply with the January 20, 2010 Agreed Order and Injunction;

- On or before February 22, 2011, counsel for the Receiver, Alco, and SonCo shall file a joint submission informing the court of SonCo's full compliance with the January 20, 2010 Agreed Order and Injunction OR SonCo shall file a brief to show cause

5

- why the court shouldn't find SonCo in contempt of court for failing to fully comply with the January 20, 2010 Agreed Order and Injunction;

- A hearing is set for Friday, February 25, 2011 at 1:30 p.m. to address show cause issues and the remedy to be entered for SonCo's failure to fully comply with the January 20, 2010 Agreed Order and Injunction. If the court is notified of SonCo's full compliance by February 22, 2011, then this hearing will be vacated;

- If SonCo is found to be in contempt of court, the penalty to SonCo might be entry of the proposed order filed by the Receiver and Alco, that was the subject of the January 21 hearing, see Exhibit 1 to Motion, Dec. 16, 2010 [Doc. No. 723-1], or an order substantially similar to that proposed order . . . .

(Doc. # 732, at 1-2).

C

On February 22, 2011, SonCo filed a brief contending that it was in compliance with the January 2010 order. In that brief, SonCo presented the arguments later considered by the court of appeals — that Alco and the receiver never could have gotten their bond back, that the January 2010 order had no time limits, and so on. The receiver and Alco responded with submissions explaining why SonCo was in contempt. The court of appeals eventually focused, and properly so, on SonCo's refusal to post the $250,000 bond required by the January 2010 order. But SonCo's intransigence extended beyond the bond. SonCo had to file what the Texas Railroad Commission calls "P-4" forms to replace Alco

6

as the officially recognized operator of the leases. SonCo hadn't done so by January 24, 2011 (more than a year after the entry of the January 2010 order), so Alco remained as the leases' operator of record. As the operator of record, Alco needed to tend to the wells and risked liability for any environmental problems. This court ordered SonCo to take over as operator within the next thirty days — by the time of the February 25 show cause hearing. By February 25, SonCo had filed all or most of its P-4s, but the Texas commission was still reviewing them. When the remedy order was entered on March 1, Alco had been the leases' official operator for nearly fourteen months after the January 2010 order that was to transfer the operatorship responsibilities to SonCo.

The court heard the parties' arguments at the February 25 show cause hearing, found SonCo in contempt, and invited post-hearing briefing on the remedy.

On March 1, 2011, after further argument, the court ordered SonCo to execute a quitclaim deed for the leases within seven days or face a daily fine of $10,000 for further delay. The court also directed that SonCo wasn't to get the $600,000 back because

> that money must be used to compensate the attorneys for Alco and the Receiver. That money must also be used to compensate Alco for the harms caused by SonCo's noncompliance with the January 20, 2010 order and injunction. Those uses of the $600,000 will make the Receiver and Alco whole and will replenish funds that should have been returned to defrauded investors but instead have been dipped into as a result of SonCo's contempt of court.

(Doc. # 752, at 4). The court also expressly relieved SonCo of the obligations to post a $250,000 bond, operate the leases, and pay remaining real estate taxes due on the leases. The court confirmed the January 2010 order's dismissals and releases concerning the Texas and Canadian litigation.

D

SonCo appealed. The court of appeals affirmed the finding that SonCo violated the January 2010 order by not replacing Alco as operator of the leased wells, Securities and Exch. Comm'n v. First Choice Mgmt. Servs., Inc., 678 F.3d 538, 543 (7th Cir. 2012), but remanded for this court to explain the basis for the remedy encompassed in the March 2011 contempt order. It appeared to the court of appeals that this court had treated SonCo's conduct as civil contempt, 678 F.3d at 544, but the March 2011 order's lack of explanation of the reasons behind the remedy raised an issue as to whether the remedy was in civil contempt (which a court can enter to compensate the party harmed by the contempt) or criminal contempt (which alone can justify punishment of the contemnor, and must be preceded by criminal proceedings under Federal Rule of Criminal Procedure 42).[2] The remand order defined what this court was to do:

> The judge on remand will have three options: reimpose the sanction he imposed, upon demonstrating that it is a compensatory remedy for

---

[2] Unfortunately, the March 2011 order also used the word "penalty" at one point (Doc. # 752, at 4), which couldn't have advanced understanding of the nature of the remedy.

> a civil contempt after all; impose a different, or perhaps no, sanction whether for civil contempt or for misconduct not characterized as contempt; or proceed under the rules governing criminal contempt.

678 F.3d at 546. This memorandum is intended to provide that explanation.

II

This was an instance of civil contempt with a compensatory remedy. The court of appeals set out the law applicable to civil contempt, 678 F.3d at 543-545, and this court has no reason to add anything other than its understanding (in 2011 as well as today) that a compensatory civil contempt remedy can be based on a reasonable approximation of losses if the contemnor doesn't show error in the figures offered by the party harmed by the acts of contempt. F.T.C. v. Trudeau, 579 F.3d 754, 773 (7th Cir. 2009).

A

This court drafted the March 1, 2011 order in haste. The receiver told the court that the leases would revert in a matter of hours after briefing was complete. As a result of that haste, this court left both the remedy's nature and its underlying reasoning insufficiently explained. The time constraint only explains, without justifying, the order's inadequacy; the court could have followed the order with an explanatory memorandum, but didn't. The resultant opinion thus fell short of what a civil contempt order must be. Mid-American Waste Sys., Inc. v.

9

City of Gary, 49 F.3d 286, 293 (7th Cir. 1995) ("A judge reckoning a compensatory award must make subsidiary findings that permit the parties (and the court of appeals) to know the basis of the decision.").

The need for quick action, though, provides part of the explanation for the remedy contained in the March 2011 order. Given SonCo's record of truly brazen intransigence, the court wanted to close the books on SonCo's dealings with the receiver.[3] The receiver had recommended a remedy that would have continued the relationship, though — if SonCo behaved this time — for only 90 more days. The court chose not to adopt that remedy in its entirety, believing that to do so would delay the distribution of money investors had lost more than a decade earlier, and that to do so might not remove SonCo from the stage.[4] Further attorney fees might have devoured much of the money the receiver had retrieved: SonCo most recently had begun to quibble over which leases it had acquired (it hadn't paid taxes on two of the leases for which it filed P-4s, and it had filed P-4s for some leases not covered by the January 2010 order). This twelve-year-old receivership's purpose has been to acquire and distribute money the investors lost. Continuing SonCo's

---

[3] "The court states clearly here that with today's order, SonCo's involvement will end." Mar. 1, 2011 Ord. (Doc. # 752), at 3.

[4] "For these reasons, this court cannot approve leaving any ball in SonCo's court. While SonCo's counsel has done an admirable job with a bad situation, SonCo has proven itself to be eminently unreliable and has caused much harm. The court will not order the proposed alternative remedy because the harm has been great, and because the court has no assurance that a lien imposed would result in anything and has no assurance that at the end of 90 days SonCo will have taken actions to prevent the evaporation of the leases in question. Defrauded investors, the state of Texas, and property holders in Texas cannot be asked to be held hostage any longer." Mar. 1, 2011 Ord. (Doc. # 752), at 3.

involvement with the leases threatened that purpose, so ending SonCo's impact on distribution of funds was one purpose of the March 2011 remedy order. Returning the leases to the receiver, the court believed, severed SonCo's relationship to the receivership for good.[5]

The other purpose of the March 2011 order was to compensate the receiver and Alco for harm they suffered from SonCo's contemptuous conduct. Consistent with the goal of ending immediately SonCo's ability to impair the receivership, this court used very rough estimates of what would be needed to compensate the receiver and Alco and prevent SonCo from a windfall based on its own contempt. The materials before the court at the time of the March 2011 order made clear that compensation of at least $600,000 was warranted, and neither the receiver nor Alco (both of whom might have placed great non-monetary value on simply being clear of SonCo) sought more than that sum.

SonCo's fourteen months of disobedience had depleted the $580,000 it had paid the receiver and Alco under the January 2010 order (setting aside the $20,000 the parties agreed to tack on for delay). In a February 24, 2011 filing, the receiver estimated that $70,000 in attorney fees (beyond what the court eventually would award separately to Alco's counsel) had come out of the $580,000 that was to go to defrauded investors, along with an estimated (but unsettled) $30,000 for

---

[5] The court's thinking was chimerical. Even aside from the appeal, SonCo appears to have remained involved with the leases. Precisely what SonCo has done hasn't been resolved (*see* Part II-B *infra*), but it hasn't furthered the purposes of the receivership.

11

people the receiver had hired in Texas to keep things going while SonCo dawdled. (Doc. # 741). SonCo didn't challenge those estimates.

The January 2010 order had required SonCo to assume "compliance costs" assessed against Alco (the registered operator). SonCo hadn't done that because it never became the registered operator. The receiver had presented the court with two ways to value those compliance costs. First, the Texas Railroad Commission had liquidated the compliance costs for the wells at $498,113.00. (Doc. # 723-2). The receiver also reported the possibility that Alco or its successor might be required to plug some or all of the thirty-nine wells; at a cost of $20,000 per plugged well, that route of compliance could run as high as $780,000. (Doc. # 723). SonCo didn't challenge those figures, and the March 2011 order didn't shift those obligations to Wilson Operating Company.[6]

The January 2010 order had given SonCo far more than the oil and gas leases. Among other things,[7] the order released SonCo from liability in Canadian litigation in which the receiver had a $2 million claim against SonCo. Some portion of the $580,000 SonCo paid must be attributed to the release of this claim. In light of SonCo's grousing in 2011 about the leases and its refusal to

---

[6] This places the compliance costs on a different footing than the bond by which SonCo was to have replaced the $250,000 bond that Alco had posted with the receiver's money. As the court of appeals noted, 678 F.3d at 546, the March 2011 order required Wilson Operating Company to pay the receiver and Alco $250,000, thereby clearing that slate. No such order would compensate Alco for the compliance costs incurred after SonCo was to have taken over.

[7] The January 2010 order also awarded SonCo the 90-day injunction already discussed and the ability to use an exhibit to the parties' motion (Doc. # 681-4) as title to record immediately or to use to get full legal and equitable rights to the leases.

become the operator since the January 2010 order, the receiver now argues that the releases were worth at least $580,000 (if the leases were worthless, the whole $580,000 must have been for the releases), and as much as the $2 million sought in the Canadian class action, to SonCo.

Litigation by the receiver and Alco against SonCo in Archer County, Texas also was dismissed pursuant to the January 2010 order. SonCo drew down a $25,000 bond with the Archer County court. The receiver thought SonCo wasn't entitled to that bond; the court knows too little about the situation to agree or disagree.[8] But SonCo faced liability in Archer County, Texas before the January 2010 order and was released from that liability. That release had value to SonCo, at least to the extent of the use of $25,000 bond.

Whatever the value of those releases and dismissals was, it was a gain for SonCo that became unjustifiable when SonCo refused to comply with the rest of the January 2010 order. More importantly, it was a corresponding loss to the receiver and Alco that was a proper subject for a compensatory civil contempt award.

These were the estimates of what it would take to compensate the receiver and Alco:

- somewhere between $498,113.00 and $780,000 in compliance costs;

---

[8] The court knows, though, that SonCo had petitioned the court for permission to take that $25,000 bond (Doc. # 529), and the court denied the request (Doc. # 592). SonCo hasn't explained its authority to take down the bond after the court denied permission.

- another $70,000 in attorney fees the receiver incurred after the January 2010 order appeared to end this part of the receivership, bringing the total to somewhere between $558,000 and $950,000;

- another $30,000 paid to hirees in Texas to keep things going through the 400+ days after the January 2010 order was entered, bringing the total to somewhere between $588,000 and $980,000; and

- a nontrivial sum for the receiver's release of SonCo from a $2 million class action suit in Canada and for dismissal of a Texas state court action in which SonCo was able to withdraw its $25,000 bond.

These estimates produced a range of compensation in the range of $613,000 and $1,005,000, well in excess of the $600,000 the court allowed the receiver and Alco to retain. Beyond that, the settlement cost the receiver his opportunity to prove SonCo's fraud at trial in this case. That opportunity can't be quantified.

It might be argued that this calculation doesn't take into account the receiver's opportunity for healthy compensation from re-conveying the leases to Wilson Operating Company, the successor buyer/operator of the leases. As already noted, the court couldn't know the precise portion of the $580,000 SonCo allocated to the leases as opposed to the releases from potential liability. But what Wilson Operating Company received didn't appear to be worth anywhere near what SonCo had paid. First, SonCo told the court in its submissions in 2010 and 2011 that these wells were hard to find and (to the extent SonCo could locate

them at all) were in increasingly poor condition. Setting aside the still puzzling question of why SonCo had agreed to acquire the leases at all under those conditions, the court was persuaded that in March 2011, the leases weren't worth anything near what they had been worth fourteen months earlier. The court so found in the March 2011 order.[9] Further, Wilson Operating Company might not even have acquired the leases for all thirty-nine wells: the March 2011 order (embodying the agreement between the receiver, Alco, and Wilson Operating Company) gave Wilson Operating Company the right to "pick and choose" — to decline to accept some of the leases, with those leases to revert under Texas law. (Doc. # 752, at 9). The March 2011 order noted that "this 'pick and choose' approach may further tax the $250,000 operating bond of Alco, but this is a necessary provision of the transaction." (Doc. # 752, at 9).

On this basis, the court ordered SonCo to convey the leases back to the receiver and walk away without its $580,000. Frankly, it appeared that SonCo was getting a better deal than the receiver, but the receiver made clear that he wanted to get back about the business of returning money to the defrauded investors, rather than incurring the expense of an evidentiary remedy hearing.

B

---

[9] "[G]iven the past 400 days during which SonCo has not taken possession of the HSS Leases, [has] not worked out a plan of compliance, and [has] not readied the HSS Leases for operation, the HSS Leases have further deteriorated, and relationships with regulators, vendors, and landowners [have] worsened." Mar. 1, 2011 Ord (Doc. # 752), at 9.

Following remand, this court invited the parties' briefs on the issues presented by the appellate opinion. Evidentiary material accompanied some of those briefs, triggering in turn motions to strike portions of the evidentiary material based on hearsay, not based on personal knowledge, or protected as part of settlement negotiations. The court needed no evidentiary material to know how and why it ruled in March 2011, and the court hasn't relied on any of the post-remand evidentiary material to this point in this memorandum. Because the following comments address only what was filed, and not the truth of statements made in those materials, the court denies the motion for an evidentiary hearing and the motions to strike portions of exhibits. The court treats the evidentiary material only as indication of what the parties would try to prove at an evidentiary hearing.

The receiver's materials indicate that the court's estimate of the figure needed to compensate the receiver and Alco erred on the low side. Having had a chance to bring his books up to date, the receiver reports that between the January 2010 order and the March 2011 order, he had paid $47,000 in enforcement costs, $79,000 in attorney fees in dealing with Texas entities, $59,000 in attorney fees (including legal services provided by the receiver himself) in dealing with modification or enforcement of the January 2010 order, and $350,000 to Wilson Operating Company for serving as contract operator of the leases in lieu of SonCo. It's difficult to line these figures up perfectly with the

figures that were before the court in early 2011, but these numbers appear to be anywhere from $300,000 to $500,000 higher than what the court estimated in March 2011.

Since the March 2011 order, the receiver says, SonCo (which didn't seek a stay of the March 2011 order pending appeal) interfered with Wilson Operating Company's efforts to operate and/or convey some of the leases, first through conversations with the Texas Railroad Commission and later by the filing of a *lis pendens* notice, without giving notice to the receiver or to the buyer/operator Wilson Operating Company. Through these acts, the receiver says, SonCo has prevented others from the benefit they were to get, not only from the January 2010 order, but also from the March 2011 order.

For these reasons, this court requests that if the court of appeals finds inadequate the reasoning this memorandum sets forth for the remedy ordered in March 2011 for SonCo's civil contempt, and remands for further fact-finding, that the court of appeals also say whether a remedy based on that further fact-finding is limited to the $600,000 the March 2011 order left with the receiver.

III

For all these reasons, the court DENIES SonCo's motion for evidentiary hearing (Doc. # 828) and motions to strike (Docs. # 829, 830, 831, 832). The clerk

shall send a copy of this memorandum forthwith to the United States Court of Appeals for the Seventh Circuit for inclusion in that court's Cause No. 11-1702.

SO ORDERED.

ENTERED:   September 6, 2012

  /s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Judge
United States District Court