UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

SECURITIES & EXCHANGE      )
COMMISSION,                )
                           )
            Plaintiff      )
                           )
      vs.                  )      CAUSE NO. 3:00-cv-446-RLM-CAN
                           )
FIRST CHOICE MANAGEMENT     )
SERVICES and GARY VAN       )
WAEYENBERGHE,               )
                           )
            Defendants     )

OPINION AND ORDER

Originally filed by the SEC, this case has been going on for more than a

decade and a half, and most of the history can be omitted. In 2000, this court

appointed Joseph Bradley as receiver, with instructions to try to recover as much

as possible of the funds invested by victims of a Ponzi scheme that Gary

VanWaeyenberghe conducted through First Choice Management Services. The

receiver has been remarkably successful in recovering those funds, but some

difficult dealings have caused the case's longevity. Today's issues involve one of

those difficult dealings.

Some of the funds found their way into a group of seven oil and gas leases

located on Osage tribal territory in Oklahoma. The receiver located those leases

in the possession of Branson Energy, Inc., of which John Hannah (known to all

as "Bill") appears to be the alter ego. In September 2003, the court ordered the

freeze and turnover of the Branson Energy leases to the receiver. Mr. Hannah and

the receiver entered into a memorandum of understanding for the sale of the leases in 2004. The sale never took place.

But the memorandum of understanding required Mr. Hannah to produce Branson Energy records. Even without the sale by Branson Energy, the receiver gained ownership of those records by the court's freeze and turnover order because the funds were traced to those leases. The marketability and value of those leases depends on the availability of many of the records that Mr. Hannah had promised to turn over. Operating an oil and gas lease on tribal territory involves paperwork demanded by a host of federal, state and tribal agencies, some of which must be accompanied by a sworn certification of the truthfulness and accuracy of the information in the paperwork.

Mr. Hannah's obligation under the memorandum of understanding to produce records evolved into a series of orders to produce those records. Among the records he is to produce under those orders are well production records and corporate records, and he hasn't produced those records. In January 2014, the court ordered the receiver to sell the leases for the benefit of the fraud victims. Technically, the receiver can convey the leases without those records. But without the records, the leases' value is foggy at best, and the market for the leases consists only of people willing to buy something of unknown worth — a dwindling market in a day of plunging oil prices.

Even with those limitations, the receiver found a potential purchaser: Wilson Operating Company. But Mr. Hannah still didn't produce the records, and

Wilson eventually dropped out of the picture while the receiver was trying to acquire the records.

The receiver found another prospective purchaser from an unusual source. Rick Coody worked for the receiver as the person on the scene. When Wilson Operating Company dropped out, Mr. Coody expressed interest in purchasing the leases on behalf of his own business, called PEMCO. Mr. Coody's proposed price was considerably lower than what Wilson had offered — the demand was low, the price of oil and gas had dropped, and needed repairs had increased.

Mr. Coody insists on seeing the records that Mr. Hannah hasn't produced, and not just for the reasons already outlined. From the records Mr. Coody has seen, one percent of the profits from the leases goes to Mr. Hannah and the other 99 percent goes to an entity called CRM Energy Partners, Inc. Mr. Coody has no idea who the principals of CRM Energy Partners might be, or what contractual arrangement it might have with Mr. Hannah. Mr. Hannah testified at the contempt hearing that he was the sole shareholder of CRM Energy Partners, but at this point in the litigation, the receiver and Mr. Coody would find something on paper more trustworthy. It's not intuitively apparent why Mr. Hannah would have gone out of his way to split the income from the leases with another entity of which he was the sole shareholder (CRM).

Further, as part of the proposed sale to Mr. Coody, the receiver would convey the right to disgorgement — the right to funds that can be traced to the defrauded investors. The right to disgorgement nears worthlessness if Mr. Hannah

withholds the records needed to trace the investors' funds.

Mr. Hannah and CRM have been ordered to produce these records several times. In May 2014, the court ordered that anyone in possession or control of "information pertaining to the operatorship or ownership of the Branson Energy leases [or] Branson" turn the information over to Wilson Operating Company's agent or designee within three business days. (Doc. #922). Three days stretched into weeks, then months, first imperiling, then killing, the sale to Wilson Operating Company. Despite the issuance of a writ of assistance in October 2014, and the help of the United States Marshal Service in Oklahoma on November 4, 2014, nothing happened. The court restated that order on November 10, 2014, further explaining its *in rem* jurisdiction over all Branson Energy assets. At that point, CRM Energy and Mr. Hannah were telling regulators that CRM Energy was the owner and operator of the leases.

In an April 2015 order denying a motion to reconsider, the court tried to state in plain English exactly what had to be produced:

> Finally, CRM Energy and Mr. Hannah again ask for direction as to what exactly is being requested from them. Paragraph twelve of the sale order is sufficiently clear regarding the documents CRM Energy and Mr. Hannah – as entities and persons in possession or control of information related to the leases – are compelled to produce. Nonetheless, the court offers some further guidance. CRM Energy and Mr. Hannah must produce copies of any document in their possession or control that has information from 2002 to 2014 and is related to the following:
> - the production of the leases, including the production records maintained by the third-party vendor;
> - the expenses of the leases;
> - the financials related to the leases;

> - the use of the proceeds of the lease production;
> - the employees that worked on the leases;
> - the corporate business of the leases; and
> - the government regulation of the leases.
>
> As already stated, CRM Energy and Mr. Hannah must also turn over copies of the documents the BIA requires them to maintain and documents related to their operatorship of the leases.

(Doc. #975). The court warned that if Mr. Hannah and CRM didn't produce the records (and take specified steps in other litigation) by April 22, 2015, the court would hold them in contempt and fine them $1,000 per day of non-compliance, not to exceed the costs, legal fees and losses the delay imposes on the receivership. One of the things the April order required to be done within two weeks was the removal of a lien Mr. Hannah and CRM Energy had placed on the leases in the Oklahoma state courts in 2014. Mr. Hannah removed the lien, but not until two days after the deadline. He explains that he had to send the release twice because he didn't know a fee was needed.

On August 31, 2015, the court reissued the sale order, this time running to the benefit of Mr. Coody's PEMCO. The order required anyone in possession or control of documents relating to Branson Energy and its leases to turn such documents over within three business days.

Mr. Hannah wasn't the only one in possession of the records. Branson Energy had retained Nona Roach to prepare forms required by the government, and provided her with its records — including well production numbers — so that she could do so. When trying to execute the October 2014 writ of assistance, the Chief Deputy Marshal told her she had to produce the records. She has

steadfastly refused to do so since then. On November 19, 2015, the court specifically ordered her and her business (Agape & Associates) to produce specified documents to the receiver's counsel, within fourteen days. She didn't comply, and still hasn't complied.

The Chief Deputy United States Marshal served Mr. Hannah with the writ of assistance on November 4, 2014. Mr. Hannah said the order gave him three days to comply, and he would take that time. Mr. Hannah's first production of documents under the October 2014 writ of assistance occurred on November 7. The documents he produced consisted of records relating to times before Mr, Hannah took over the leases. Mr. Coody said he needed more recent records, and Mr. Hannah produced more documents on May 10, 2105, consisting of two deliveries. None of the second wave of documents included corporate records or well production records. At the time of the second delivery, Mr. Coody asked Mr. Hannah about those records, and Mr. Hannah said Mr. Coody (who then represented the receiver) would have to get those records from Nona Roach of Agape Associates, who prepares Mr. Hannah's reports to the various agencies that required reports.

The receiver obtained an order from this court compelling Ms. Roach and Agape to produce the records. She has refused to produce the records. In letters to the court, she explains that the receiver can get the items filed with the Bureau of Indian Affairs from the BIA, and that she has a lien on the records because Branson Energy owes her for producing the reports.

The outside date of February 15, 2016 on PEMCO's interest in purchasing the items brought the non-production issue to a head. The receiver filed an emergency motion for a rule to show cause. Mr. Hannah appeared and participated in a show cause hearing that lasted two days. Ms. Roach sent emails, but declined to attend.

The court allowed an unusual hearing. A court has the inherent power to enforce compliance with court orders, and can direct a party to appear and show cause why he or she should not be sanctioned. *See* United States v. Dowell, 257 F.3d 694, 699 (7th Cir. 2001). Such contempt proceedings are equitable in nature, Connolly v. J.T. Ventures, 851 F.2d 930, 932 (7th Cir. 1988), so the court has broad discretion in conducting them. The receiver seeks enforcement of an extraordinary fine against Mr. Hannah and CRM. Mr. Hannah wrote to the court the week before the hearing to report that he had suffered a stroke or a series of strokes, and asked if his wife could assist him at the hearing. The request came too late for the court to act on it before the hearing. Mr. Hannah and CRM had no counsel. When Mr. Hannah tried to cross examine a witness at the hearing, it became clear that he couldn't focus well enough to stay on topic from the beginning of a question to the end. The court allowed Mrs. Hannah to cross examine the receiver's witnesses — a privilege rarely offered to a non-party who isn't an attorney. The court also allowed her to prompt Mr. Hannah during his direct testimony.

The court also allowed Mrs. Hannah the broadest imaginable scope of questioning. That exercise of discretion extended the hearing by hours. Despite her best efforts, her questions were invariably compound, and often turned out to ask for information that the beginning of the question wouldn't lead anyone in the courtroom to expect. As a result, though the court allowed Mrs. Hannah a wide range of cross examination topics, the cross examinations produced little information pertinent to what has to be decided today.

Mr. Hannah's memory was imperfect when the receiver called him to testify. Still, he conceded that he had possession of, but hasn't produced, his own tax returns, Branson's tax returns, Branson's corporate minutes, and the year-end statements for the leases. The document production would have been burdensome and expensive, he said. In any event, he just didn't produce the documents. He also conceded that he didn't tell Ms. Roach to produce whatever records she has.

Ms. Roach didn't attend the show cause hearing to explain her non-compliance. She has sent the court a series of emails trying to justify her absence and her refusal to produce the documents. It appears that she claims a lien on the records because Branson Energy owes her $7,710 on its account (that number somehow rose to $8,630 after the start of the show cause hearing). Among the items she sent to the court was an email that arrived after business hours on the first day of the hearing, though dated a few days earlier, asking if she really needed to attend. The tenor of most of her emails suggested a firm determination not to attend or cooperate with the court in the absence of payment of what was

then her $7,710 bill. Mr. Hannah testified at the show cause hearing that he never

got the $7,710 bill (it should be recalled that Mr. Hannah had suffered a stroke

not long before the hearing), and that he had never instructed Ms. Roach to turn

the records over to the receiver.

Neither Mr. Hannah nor Ms. Roach have given the court any basis for doing

anything other than holding them in contempt for failing to produce the records.

Mr. Hannah argues that the 2004 memorandum of understanding, in which he

first promised to produce the documents, was never formalized because the

receiver's signature never appeared on the same page as his. That argument is

legally frivolous and has nothing to do with today's issue. Mr. Hannah and CRM

were ordered by the court more than a year ago to produce specific records, and

haven't done it. Today's issue is whether they should be held in contempt and

sanctioned for that refusal to produce the documents. Mr. Hannah said a few

times during the show cause hearing that there were far too many records for him

to produce within three days. But even with a narrow view of the proceedings, he

had been ordered to produce the records almost six months before the marshal

served him with the order to produce the records within three days. It was another

six months before he produced any records relating to his/CRM's/Branson's

operation of the leases, and the records he did produce were incomplete.

This federal receivership takes precedence over whatever workman's or

mechanic's lien Ms. Roach has or might acquire in the reports she has prepared.

*See* Duff v. Cent. Sleep Diagnostics, LLC, 801 F.3d 833, 842 (7th Cir. 2015) ("A

receivership court can certainly use its equitable powers to give the receiver's judgment priority over a state-court lien obtained by a claimant subsequent to that judgment."). This receivership was established on motion of the United States Securities and Exchange Commission because Gary VanWaeyenberghe and his confederates had defrauded millions of people of their money. The receiver is tasked with recouping as much of that money lost through fraud as is possible. Some of the money went into the Branson Energy leases, and this court's orders made documents relating to those leases the property of the receiver, so that the leases can be sold for the benefit of the fraud victims, and so that if the investor funds went beyond the Branson Energy leases, the receiver can follow them.

While the final reports Ms. Roach submitted to the BIA are the product of her labor, the court's orders also required her to produce the underlying documentation from which she created the BIA reports — including the lease contracts with the BIA and the production records or logs from the gatherers/purchasers who harvest oil and gas from the leases. Ms. Roach didn't prepare this underlying documentation herself, so she would seem to have no excuse for refusing to turn it over, even if she believed she was entitled to withhold the final reports as her work product.

The court has no reason to think that Mr. Hannah and CRM don't owe Ms. Roach for the work she did for them, and that she is entitled to be paid. But the records in her possession belong to the receiver, not to Mr. Hannah or CRM, and Mr. Hannah and CRM have no right to keep them from the receiver by

encumbering them with a lien. If Ms. Roach needs originals to enforce her rights with respect to Mr. Hannah or CRM, she can provide clean copies to the receiver. But she can't withhold them.

Whether Ms. Roach fully understood those details isn't important at this point. When the marshal presented her with an order to produce the records fourteen months ago, she said she would talk to her lawyer. The marshal agreed she should do that. No attorney has appeared for her in this case, and no attorney has contacted the receiver or the receiver's representatives on her behalf. Ms. Roach hasn't indicated that she ever consulted an attorney. She simply refused to produce what she was ordered to produce.

A civil litigant can show itself entitled to an award of sanctions, without a finding of contempt, by proof by a preponderance of the evidence. *See* <u>S.E.C. v. First Choice Mgmt. Svcs., Inc.</u>, 678 F.3d 538, 545 (7th Cir. 2012). But the receiver sought a hearing at which the respondents were to show cause why they shouldn't be held in contempt, and the receiver proved by clear and convincing evidence that they — Mr. Hannah, CRM, Ms. Roach, and Agape Associates — are in civil contempt for willfully refusing to comply with court orders. The court turns to the remedy.

The remedy for civil contempt is compensatory, and the court must explain the reasoning by which the compensation is calculated. The court's earlier orders make calculation and explanation easy.

Previous orders told Mr. Hannah, CRM, Ms. Roach, and Agape Associates

what would happen if they refused to comply with the orders. The April 2015 told Mr. Hannah and CRM that the court would assess a penalty of $1,000 a day — up to the receiver's actual expenses in enforcing the order, and any losses directly related to the delay — if they didn't comply. The cap on that amount made the sum compensatory rather than punitive: the amount awarded can't exceed the receiver's expenses in trying to get the records and any losses directly related to the delay, so the amount assessed against Mr. Hannah and CRM can't turn into a penalty by exceeding the receiver's expenses. The November 2015 order told Ms. Roach and Agape Associates that if they refused to comply, they would be ordered to pay the receiver's expenses in enforcing the order against them.

Mr. Hannah and CRM were to turn over the records by April 22, 2015 — 279 days ago. At $1,000 a day, that comes out to $279,000.

Before calculating the cap — attorney fees, costs, expenses, and losses caused by the delay — the court must address a threshold issue. The receiver and his attorneys have divided their fee statements between the time spent trying to get documents from Mr. Hannah/CRM and time spent trying to get documents from Ms. Roach/Agape. The receiver asks that all respondents be jointly liable for all fees, costs, expenses, and delays. This request is puzzling. It seems unexceptionable that Mr. Hannah and CRM should be on the hook for fees, costs, expenses and delays caused by their agent Ms. Roach and Agape. But Ms. Roach and Agape weren't ordered to produce documents that Mr. Hannah and CRM possessed, and the receiver has presented no persuasive reason Ms. Roach should

compensate the receiver for what she wasn't ordered to do.

Mr. Hannah and CRM's refusal to turn over the documents when they were ordered to has cost the receiver (and so the investors) dearly. PEMCO isn't willing to pay what Wilson Operating Company would have paid; as already discussed, the property needs more repairs and the price of oil has plunged. The difference between what the receiver could have gotten from selling the leases to Wilson Operating Company and what it can get from selling the leases to PEMCO is $75,000.

That said, the amount attributable to the efforts to get documents from Ms. Roach and Agape — a sum for which Mr. Hannah/CRM and Ms. Roach/Agape would be jointly liable — is $41,305.24, calculated as follows:

Attorney fees:
    Michael Katz            27,362.50
    Shawn Sullivan          10,780.00
    Joseph Bradley           1,250.00
Expenses related to witness
Rick Coody                   1,572.41
Costs                          340.33

The amount attributable solely to the efforts to get the documents from Mr. Hannah/CRM (for which Ms. Roach/Agape aren't responsible) is $114,813.75, calculated this way:

Attorney fees:
    Michael Katz            13,525.00
    Shawn Sullivan          25,663.75
    Joseph Bradley             625.00
Loss from delay             75,000.00

Adding back in the $41,305.24 attributable to trying to get Mr. Hannah/CRM's documents from Ms. Roach/Agape, Mr. Hannah/CRM would be liable for $156,110.01, with Ms. Roach/Agape jointly liable for up to $41,305.24.

Because those figures are less than the sanction calculated on a per-day basis, they serve as a cap, and are the sanctions to be imposed. Further, they are reasonable as sanctions. This fight — in which Mr. Hannah/CRM have lost at every turn but never complied with the court orders — has bled the receivership dry. The purpose of the receivership was to return money to fraud victims, not to pay lawyers. The receiver and his attorneys have devoted extraordinary time and expense to trying to get from Mr. Hannah and his agents what is needed to sell the leases. The receivership now has on hand $17,000 (a fraction of what the fight with Mr. Hannah and his agents has cost), only a little more than half of which is earmarked for the investors. The stubborn recalcitrance of Mr. Hannah and his agents has subverted the purposes of the receivership, and there is no reason either the investors or the receiver's counsel should bear the cost of that recalcitrance.

That brings us only to the date of this order: the receiver has a money judgment, but still doesn't have the documents needed to sell the leases. Mr. Hannah and his agents still need to turn over the documents in their possession or control, so a further order is needed.

That order won't require Mr. Hannah to turn over his personal tax returns. The order enforced today — the April 2015 "turn-over-these-specific-documents-

or-pay-$1,000-a-day" order — didn't specify personal tax returns, and nothing in the record supports a finding that Mr. Hannah's personal tax returns (as distinct from corporate returns) are needed to make the leases salable. Nor would Mr. Hannah's personal tax returns have been covered by the 2003 freeze and turnover order; whatever his tax returns might have disclosed, the returns themselves weren't proceeds of the VanWaeyenberghe fraud.

With that, the court turns to the production order:

ORDER

1.  John W. Hannah, CRM Energy Partners, Inc., Nona K. Roach, and Agape & Associates, Inc., shall by 12:00 noon, CST, on the fifth business day following the issuance of this order deliver to the Receiver at Kriege Income Tax & Bookkeeping, Attn: Michael Kriege, 410 West Rogers Boulevard, Skiatook, Oklahoma 74070, (918) 396-2313, the following documentation, including electronically stored information, which is inventoried[1] and produced in an organized, Bates numbered, indexed, labeled, chronological, categorized manner and in a readily referenced and usable format.[2] This

---

[1]   There shall be a master inventory and index which facilitates the location of documents by category, Bates number, form number, date and other significant identifying characteristics.

[2]   The protocol for production established herein applies to both documents and/or electronically stored information. All electronically stored information must be produced in a .pdf format and each electronic file must be produced with a concise, coherent, orderly and descriptive label and/or file name.

includes the following documentation which has not already been produced:[3]

a.  All records and/or documents of John W. Hannah, CRM Energy Partners, Inc., and Hannah Energy[4] in their possession and/or control encompassing the period from January 1, 2002, to January 26, 2016 pertaining to the acquisition, operatorship or ownership of the Branson Energy Leases or Branson Energy and any oil and gas production leases operated under the identity of Hannah Energy, or any of the equipment, chattels, fixtures, structures and other related property, including all documentation regarding oil and gas production from such Leases or any other oil and gas production leases in Osage County, Oklahoma.

b.  Any and all records and/or documents of John W. Hannah, CRM Energy Partners, Inc., or Hannah Energy in their possession and/or control, including those processed on behalf of Hannah Energy by Nona K. Roach and Agape & Associates,

---

[3]
Any claim that documentation has already been produced shall be subject to confirmation by the Receiver and/or PEMCO and any costs incurred by the Receiver in confirming such production shall be solely that of the party claiming prior production.

[4]
Or any entity with a variation of "Hannah Energy" in its name or corporate identity.

Inc., encompassing the period from January 1, 2002, to January 26, 2016 that are related to the following:

i.      The ownership and operatorship of the Branson Energy Leases and any other oil and gas production leases in Osage County, Oklahoma operated under the identity of Hannah Energy;

ii.     Oil and gas production of the Branson Energy Leases or any oil and gas production leases operated under the identity of Hannah Energy;

iii.    All income derived from and associated with the production and sale of oil and gas from the Branson Energy Leases or any oil and gas production leases operated under the identity of Hannah Energy;

iv.     The distribution of all income derived from and associated with the production and sale of oil and gas from the Branson Energy Leases or any oil and gas production leases operated under the identity of Hannah Energy;

v.      Such records and documentation is inclusive of, but not limited to, copies of certified monthly oil and gas lease production reports and the supporting documentation upon which they are prepared pursuant to 25 CFR 226.13(b) (BIA Forms 101, 133 and 157) and filed with the Bureau of Indian Affairs by Nona K. Roach and/or Agape & Associates, Inc., on behalf of John W. Hannah, CRM Energy Partners, Inc., or its predecessor, or Hannah Energy from 2002 through January 26, 2016, which reports represent a certification of all lease operations, whether there has been production or not, indicating therein the total amount of oil, natural gas, casing head gas, and other products subject to royalty payment, and which monthly reports were due to be filed by the 25th of each following month;

vi.     All expenses incurred and otherwise associated with the production and sale of oil and gas from the Branson Energy Leases and any oil and gas production leases

operated under the identity of Hannah Energy, including, but not limited to, production, payroll and distribution of profit;

vii.   All documentation, apart from personal income tax returns, which in any way reflects any interests, oil and gas or otherwise, acquired with proceeds from the sale of Branson Energy Lease assets (*i.e.*, equipment, oil and gas production, *etc.*);

viii.  All financial and banking records, including, but not limited to, check registers and account statements, related to the Branson Energy Leases;

ix.    All records, including, but not limited to, financial and banking records, which are related to the receipt and use of moneys from third parties which were applied toward the purchase of the Branson Energy Leases;

x.     The distribution and use of all proceeds from production of the Branson Energy Leases and any oil and gas production leases operated under the identity of Hannah Energy;

xi.    All work assignment, personnel and payroll records of employees or independent contractors who worked at or on the Branson Energy Leases and any oil and gas production leases operated under the identity of Hannah Energy;

xii.   The corporate business records of the Branson Energy Leases and those of Hannah Energy;

xiii.  All gatherers' reports, payment received reports and other records created, generated or furnished by gatherers who worked at or on the Branson Energy Leases and any oil and gas production leases operated under the identity of Hannah Energy;

xiv.   All records of governmental regulation, inclusive of BIA and EPA records, related to the Branson Energy Leases and any oil and gas production leases operated under the identity of Hannah Energy;

xv.    All documentation required to be submitted, filed, recorded and/or maintained by the BIA and the EPA;

xvi.    All documents of title associated with the Branson Energy Leases and any oil and gas production leases operated under the identity of Hannah Energy;

xvii.    All purchase, title and registration documents for vehicles in the name of John W. Hannah, CRM Energy Partners, Inc. and/or Hannah Energy;

xviii.    All loan documents and account statements which reflect the status of indebtedness upon any vehicles in the name of John W. Hannah, CRM Energy Partners, Inc. and/or Hannah Energy;

c.    All federal and state tax returns of CRM Energy Partners, Inc., or any other business entity, from January 1, 2002, to January 26, 2016 with attached supporting documentation and schedules, which in any manner reflect income received, derived from or otherwise attributable to the Branson Energy Leases or any oil and gas production leases operated under the identity of Hannah Energy.

2.    Any costs associated with the production, reproduction and delivery of the documentation which is the subject of this order shall be solely that of John W. Hannah, CRM Energy Partners, Inc., Hannah Energy, Nona K. Roach and Agape & Associates, Inc.

3.    The Receiver shall by 2:00 p.m., CST, on the fifth business day following the issuance of this order advise the court of whether there has been compliance with the delivery provisions of this order. The notification shall

only confirm that a delivery has been made and in no way shall be construed as a confirmation or verification that there has been compliance with each component of the document production requirements of this Order.

4.  If the Receiver upon examination of the documents produced pursuant to this order has cause to believe that there has been a failure of compliance with the document production requirements of this order, he shall forthwith and in as timely a manner as is practicable bring the matter to this court's attention.

5.  Should there be a failure of compliance on the part of John W. Hannah, CRM Energy Partners, Nona K. Roach or Agape & Associates, Inc., with either the document delivery or document production requirements of this Order, any non-complying person or entity shall be subject to the imposition of further sanctions by this court.

6.  Any claim by Nona K. Roach and/or Agape & Associates, Inc., for services rendered to John W. Hannah and/or CRM Energy Partners, Inc., or its predecessor, or Hannah Energy is between those parties only and no such claim exists against the receiver or any transferee of the receiver. The assertion of any such claim before any court or administrative agency shall be illegal, null and void and constitute a violation of the orders and exclusive jurisdiction of this court over the Branson Energy Leases, shall result in the person or entity asserting the claim being held in contempt of

court and shall subject the claimant to an award of attorney fees, all expenses and losses incurred in defending against such claim and further sanctions.

7.      John W. Hannah, CRM Energy Partners, Inc., Hannah Energy, Nona K. Roach and Agape & Associates, Inc., are hereby enjoined and restrained by the United States District Court for the Northern District of Indiana, South Bend Division, which retains exclusive jurisdiction over the Branson Energy Leases, from changing, altering, modifying, removing, transferring, destroying or in any manner tampering with the content and integrity of any of the documentation subject to the provisions of this Order.

IT IS FURTHER ORDERED that the Receiver shall serve this Order upon John W. Hannah, CRM Energy Partners, Inc., and Hannah Energy at 16540 Ranchland Road, Skiatook, Oklahoma 74070, and/or 3118 Winberry Drive, Franklin, Tennessee 37064, *e-mail:* CRM 700@aol.com; upon Nona K. Roach and Agape & Associates, Inc., 441 2nd Street, Avant, Oklahoma 74001, *e-mail:* nroach@windstream.net; upon Eddie Streater, Regional Director, BIA, 3100 West Peak Boulevard, Muskogee, Oklahoma 74401, *e-mail:* Eddie.Streater@bia.gov; upon Robin M. Phillips, Superintendent, BIA Osage Agency, 813 Grandview Avenue, Pawhuska, Oklahoma 74056, *e-mail:* Robin.Phillips@bia.gov; and upon Geoffrey Standing Bear, Principal Chief, 627 Grandview Avenue, Pawhuska, Oklahoma 74056, *e-mail:* ootc@osagenation-nsn.gov, by U.S. Mail, facsimile

transmission, electronic mail or otherwise and file notice of service with the Clerk of this Court.

The clerk shall enter judgment jointly against John W. Hannah, CRM Energy Partners, Nona K. Roach and Agape & Associates, Inc., in the sum of $41,305.24, and a further judgment jointly against John W. Hannah and CRM Energy Partners in the sum of $114,813.75.

ENTERED: ___January 26, 2016___

___/s/ Robert L. Miller, Jr.___
Robert L. Miller, Jr., Judge
United States District Court